UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Erin P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19 CV 50028 |
| | ) | Magistrate Judge Iain D. Johnston |
| Andrew Saul, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff, who is now 41 years old, worked for 15 years as a quality control inspector until her health problems forced her to stop working. In July 2015, she applied for Social Security disability benefits claiming lupus as her primary impairment.[1] Her lupus causes joint pain and swelling, fatigue, breathing problems, leg pain, hair loss, and blisters on her hands. She testified that the blisters on her hands sometimes get so bad that she has to twist doorknobs using the back of hands. Since 2014, she has tried various medications to control these symptoms. Although these medications have helped (how much so is in dispute), she still has periods where her symptoms worsen. In the terminology used by lupus patients, these periods are called flare-ups or flares. This somewhat-hard-to-define concept is at the forefront of this appeal.

Plaintiff was diagnosed with lupus by Dr. James Davidson. He started treating plaintiff in February 2014 and was still treating her at the time of the administrative hearing in October 2017. Over this three-and-a-half year period, he saw plaintiff every two months on average and

---

[1] Plaintiff has also been diagnosed with a few other conditions—such Sjogren's syndrome, antiphospholipid syndrome, deep vein thrombosis—but these seem to be overlapping impairments. Therefore, to simplify matters, we will confine the discussion to lupus, which is the approach taken by the parties.

coordinated her care when she made multiple trips to the emergency room. Although he is a rheumatologist, he has been acting has her primary care physician. Shortly before the hearing, he completed a five-page form entitled "Lupus (SLE) Medical Source Statement." Ex. 7F. On this form, he opined (among other things) that plaintiff would not be able to sit, stand, or walk for more than two hours; would be "off task" 25% of the workday; would only be able to use her hands for manipulative activities 5% of the workday; and would miss more than four days a month. It is undisputed that, if these limitations were accepted, plaintiff should be found disabled. But the administrative law judge ("ALJ") rejected this opinion and instead relied on the opinion of Dr. Sai Nimmagadda, who testified at the administrative hearing. This lawsuit is essentially a battle between these two opinions.

Relying on Dr. Nimmagadda's testimony, the ALJ found that plaintiff could do sedentary work. The ALJ's main rationales were the following: (1) plaintiff only had a "few intermittent documented flare-ups"; (2) each flare-ups was "resolved with treatment"; (3) plaintiff's examination findings and lab tests were mostly normal; (4) her daily activities were inconsistent with her allegations; (5) she declined an offer to quit smoking; and (6) she received only conservative treatment. R. 38, 44-45.

Before turning to the arguments for a remand, which descend into the jargon-filled weeds of the medical record, it is worth stepping back for a moment to set forth some basic background information.[2] Lupus is an autoimmune disorder in which the individual typically has periods where symptoms are mild or even non-existent interspersed with flares. Symptoms vary person

---

[2] The following facts are based on information from the websites for the Mayo Clinic, the Lupus Foundation of America, and the Lupus Society of Illinois. The parties cited to these websites to make discrete arguments, such as the effect of smoking on lupus. To be clear, these websites do not supply dispositive answers to the issues raised in this appeal, and the Court did not consult these cited websites for that purpose. A medical expert on remand will be needed to answer these medical questions with more certainty.

to person and not everyone has all the same symptoms, but common symptoms include a butterfly rash across the face, rashes on other parts of the body, painful or swollen joints, leg swelling, fever not caused by an infection, increased fatigue, sensitivity to the sun, and mouth ulcers or sores. In more serious cases, the condition affects organs such as the lungs and heart. Lupus is not easy to diagnose. The Lupus Foundation of American explains as follows:

> Diagnosing lupus can be challenging. There's no single test that can give doctors a "yes" or "no" answer. Sometimes it can takes months—or even years—to gather all the right information. Making a lupus diagnosis is kind of like putting together a puzzle. Your doctor will look at several different puzzle pieces: your symptoms, medical history, family history, and lab tests. If enough of the pieces fit together, you may be diagnosed with lupus.

LFA Website ("Diagnosing Lupus"). This website further states that a "test result may be positive one time and negative another time." For these reasons, the final assessment must be made by a physician who has considered all the factors and who has observed the individual over time. In addition, lupus is not easy to treat. Here too, close coordination with the treating physician is important, as both the benefits and risks of various treatments must be considered.

## I.     The Flares

Although plaintiff's primary argument centers on the medical opinions, plaintiff makes a more preliminary argument, which is that the ALJ erred in the basic factfinding job of determining the frequency and severity of her flares. The Court agrees this topic was not adequately developed. These two questions—frequency and severity—are critical because everyone agrees on the general point that plaintiff has experienced *some* flares and has also had other milder periods where her symptoms were quiescent. The pertinent question is whether the flares were relatively infrequent or mild, as the ALJ claimed, or were so numerous or severe so as to cause, for example, too many work absences (one of Dr. Davidson's predictions) or to prevent plaintiff from working a full eight-hour shift. In short, the devil is in the details. To

3

answer this question, it is necessary to dig underneath vague words like "intermittent," "few," "most," or "often"—all of which were used to describe the number of flares or alternatively the number of normal findings. The Court recognizes that the task of defining lupus flares with precision is not easy, even for doctors.[3] Despite this fact, it is still important to know what definition or criteria the ALJ and the medical experts were relying on to determine the number of flares. A number of definitions were floating about, and the parties were not always clear which one they were using. Without knowing the definitional criteria, it is difficult to know whether the evidence was sufficient to meet it.

This confusion was present throughout the administrative hearing. To recap, plaintiff testified first, stating that she could not work because she had "a lot of pain and swelling, and exhaustion." R. 64. The ALJ asked how often these symptoms occurred, and plaintiff answered—"every day." *Id.* Later, plaintiff's counsel took over the questioning and again asked about the flares, but this time defined them as being times when "everything got real bad and you had to take extra medication." R. 69. Plaintiff did not directly respond to this question, but instead fell back on her answer that her symptoms occurred every day. The ALJ then interrupted, explaining that symptoms occurring every day should be called "chronic" and were "not a flare." R. 70. The ALJ then asked again how often plaintiff had flares. This time she gave a different answer, stating that they occurred "maybe monthly or every other [] couple of weeks." *Id.* The ALJ then tried to get plaintiff to explain what distinguished the flares from the everyday symptoms. Plaintiff did not provide any bright-line answer although she noted she would typically get more exhausted and her symptoms would be more severe. R. 71. The ALJ then suggested she was not actually having any flares because, in the ALJ's words, "it's just the same

---

[3] The Lupus Foundation of America states on its website that it "spearhead[ed] a four-year, worldwide initiative to develop the very first universally accepted definition of a lupus flare." The results were published in 2010.

thing every day." *Id.* This led to a back and forth, with plaintiff's counsel first complaining that the ALJ was mischaracterizing plaintiff's testimony and the ALJ then responding that counsel was trying to "answer these questions for" plaintiff, and then counsel responding back that the ALJ "kind of, butted in" when counsel was asking questions. *Id.* Although this exchange did not appear to be acrimonious, it also did not lead to any clear answers. Plaintiff stated, for the second time, that the flares occurred "every couple of weeks" but she added the new detail that they typically lasted "probably four days." R. 73. She explained that when her symptoms worsened she got help from family members. The ALJ asked whether she told Dr. Davidson when she had a flare. She stated that she told him "as much as [she] can when [she sees] him." R. 74. In sum, plaintiff's testimony left two answers floating about, one that the flares occurred every day and the other that they occurred, on average, once every two weeks to once every month.

Turning to Dr. Nimmagadda's testimony, we find a similar vagueness. When first asked about this issue, Dr. Nimmagadda's first response was telling. He noted simply that the record was "complicated." R. 87. In his ensuing testimony, he never precisely stated how many flares plaintiff had, but rather offered more in the nature of loose observations. He stated, for example, that the flares decreased during plaintiff's pregnancy and were "intermittent" thereafter. *Id.* The word "intermittent" was repeated often and served as a mantra of sorts. Dr. Nimmagadda did identify two flares. He stated that plaintiff had an "acute" flare when she was hospitalized in February 2017 and that "one episode of thrombophlebitis [was] noted in 2016." *Id.*

After mentioning these two instances, he acknowledged that plaintiff likely had other, less-than-acute flares, although his testimony is somewhat vague. Here is the key part:

> Intermittently, there's been some records in the file that she does have joint pain, swelling and pressure of her hands. I did note that this occurred intermittently. It's not, you know, *clearly documented* in the records of treatment the *frequency the*

5

> *Claimant has been describing*, *a daily basis or a couple of days* that she has those
> joint pain and swelling.

R. 88 (emphasis added). As a preliminary point, this testimony illustrates how the invocation of

the word "intermittent" often runs into an analytical dead end. Each time the Court read this

word in the transcript, it wanted to shout: *HOW* INTERMITTENT? This point aside, the

important point to note is that Dr. Nimmagadda was only rebutting the argument that flares

occurred on a "daily basis," and even that conclusion was hedged somewhat by the phrase

"clearly documented." But he did not directly address the more modest contention that the flares

occurred at some intermediate level—*e.g.*, less frequently than every day but more frequently

than the one-time hospitalization.

    At this point, the ALJ then offered a few suggestions. He indicated that plaintiff also

might have had a flare in January 2016 when she was in a lot of pain and again in March 2016

when she had a DVT (deep vein thrombosis) episode. But then ALJ went on to say that, after the

March 2016 episode, her exams were mostly normal. The ALJ mentioned that there was no

synovitis (*i.e.* joint pain or swelling) several times and seemed to be steering Dr. Nimmagadda

toward this particular symptom. *See* R. 89 (ALJ: "Correct me if I'm wrong. She's got

tenderness, but a lot of the exams show that she's got no swelling and no synovitis. Am I wrong

about that, or not?"). Dr. Nimmagadda answered by discussing some of the objective evidence,

briefly discussing findings about ESR rate and antibodies. He stated that, although plaintiff had

active lupus, it had not been "particularly excited" and there wasn't "the actual degree of []

progression" warranting the limitations offered by Dr. Davidson. R. 91. The ALJ asked about the

Dr. Davidson's specific limitation of plaintiff using her hands only 5% of the workday. Dr.

Nimmagadda stated "I don't see that," although he noted that "maybe" it was true when she was

in the hospital. R. 92. As for Dr. Davidson's two-hour limitation for walking, standing, and

sitting, Dr. Nimmagadda stated that he "did not see that in the record, either" because, he explained, the large joints were relatively intact and plaintiff had more problems with the small joints.[4] *Id.*

After reading Dr. Nimmagadda's testimony, the Court is not clear about his conclusions on several questions—namely, precisely how frequent the flares were, how long each individual one typically lasted, and finally what criteria he used to judge whether a flare occurred.

This confusion carries over into the ALJ's decision. To his credit, the ALJ at least tried to be more specific, but his answer ultimately is inadequate because he did not explain how it was reached. The ALJ made two statements about this issue. At the start of the medical history summary, the ALJ announced, in general terms, that there "have been few intermittent documented flare-ups, with active synovitis." R. 38. This answer does not provide a specific number, but it does at least include the qualifier "few," suggesting the number was in the range of two to three.[5] The second statement was in the analysis of Dr. Davidson's opinion. There, the ALJ stated that "the record shows only intermittent flare ups, with only three instances of synovitis." R. 45. Here, we get the precise number of three over the relevant period, which the ALJ considered to be from January 2015 to August 2017. The ALJ's answers both suggest that synovitis was the critical factor used to determine when a flare occurred.

However, there are numerous potential problems with these conclusions. First, as a basic matter of clarity, we are not sure what are the "three instances." The ALJ did not identify them by date or name. The medical record is long, with many doctor visits where plaintiff reported

---

[4] It is worth noting that the ALJ's RFC limits plaintiff to sedentary work which means that he accepted Dr. Davidson's two-hour limitation as it pertained to standing and walking.

[5] The common dictionary definition states that something is intermittent if it occurs at intervals and is not continuous, a definition that does not strictly mean the event is rare. As a general observation, the Court has ordered remands in cases where, for example, fibromyalgia symptoms were described as being only intermittent.

painful or worsening symptoms. There are well more than three episodes that arguably could be characterized (depending on the definition being used) as a flare. Without being certain which episodes the ALJ believed constituted flares and which did not, it is difficult to assess whether there was substantial evidence to support those conclusions.

Second, the ALJ emphasized the finding of synovitis, but the ALJ failed to explain why it was given such a prominent role. Importantly, no doctor assigned synovitis such a critical role in determining when a flare occurred. The lupus medical websites do not single out this symptom, although synovitis (or swelling) is clearly on most lists. Rather than focus on a single symptom or diagnostic test, the websites all emphasize that symptoms vary and that any determination that a flare was occurring or even that a person had lupus requires a careful and longitudinal assessment of many factors done by a doctor who knows the patient well. The ALJ did not explain his apparent choice to elevate this one symptom above the others.

Third, to the extent that synovitis was the defining criteria, as seems to be the case, it does not match up well with the factual record. Consider plaintiff's hospitalization in February 2017. This would seem to be an obvious candidate for one of the three flares. Dr. Nimmagadda described this episode as an "acute" flare. However, if synovitis were the criterion, this episode would not qualify. In the ALJ's summary of this episode, which by the way fails to even mention that plaintiff was *hospitalized*,[6] the ALJ does not indicate that any finding of synovitis was made. This uncertainty is why the ALJ needs to be more explicit about the criteria he was using.

Similar questions could be asked about the multiple emergency room visits. Based solely on the ALJ's own summary, the Court can identify at least five such visits—specifically, in early 2015 (R. 38); February 2016 (R. 39); March 3, 2016 (R. 40); March 25, 2016 (R. 40); September

---

[6] An uninformed reader would get the impression from the ALJ's summary that this was just a routine doctor's visit.

27, 2016 (R. 41). All these visits appear to have been related to the lupus (no other cause is suggested). Do any of them qualify as flares? If not, why? Neither the ALJ nor Dr. Nimmagadda directly addressed these questions.

Fourth, another overlooked issue concerns the ALJ's use of the word "documented." This word suggests the ALJ believed that a flare could not be counted unless it were memorialized in the medical records (*e.g.* a doctor finding synovitis). Although documentation in this manner would certainly strengthen the argument that a flare was present, this begs the question of whether plaintiff might have had lower intensity flares not severe enough to justify a doctor's visit. She went to the doctor many times and may have simply tired of going so often or may have believed there was no easy fix and would try to ride it out. She testified that she sometimes decided on her own to take more medication when symptoms worsened. Along this line, the Lupus Foundation of American has the following vignette on its website:

> Cheryl Russell, 59, of Highland Beach, FL, doesn't indulge in what she calls "symptom chasing." After more than three decades with lupus, she refuses to head to the doctor every time she has joint pain or some other problem.

*See* LFA Website ("Understanding the connection between lupus and the lungs"). The vignette goes on to emphasize the importance of still periodically checking in with one's doctor because, in this case, this person had a potentially serious lupus-related lung problem and would have benefitted by going sooner to the doctor. But for our purposes, the vignette describes how a person who has a moderate or low-grade flare might not choose to go to the doctor in every instance. If so, those flares would not be "documented." At the same time, they likely would not be as serious.

Fifth, a final but important concern is that the ALJ never made any findings about the severity or length of the individual flares. The medical history seems to indicate periods when

9

plaintiff's problems surfaced several times over a multi-week period. It is thus possible that she did not have a large total number of flares, but still had enough bad days that she could not meet the attendance requirement. The vocational expert testified that missing two days a month on average would be too many. So, if there were only three flares per year, each lasting two weeks, this would be too many.

For all the above reasons, the Court finds that a remand is required because, on this important issue of how many flares plaintiff experienced, the ALJ's conclusion that there were only a "few" is not adequately explained. The Court notes that an obvious missing piece of information is what Dr. Davidson thought about this topic. For whatever reason, the form he was given did not ask about flares.

## II.     The Medical Opinions

Plaintiff complains that the ALJ erred in rejecting Dr. Davidson's opinion and specifically failed to follow the treating physician rule. This Court agrees with the latter criticism, but finds that the analysis does not even meet the basic standards of a fair comparison.

The ALJ analyzed the two opinions separately. For the present discussion, all of the ALJ's rationales can be divided into two broader categories. The first is the objective evidence. The ALJ stated that "outside of flare-ups" plaintiff generally had stable laboratory findings. R. 45. The ALJ also stated that the limitations opined by Dr. Davidson—in particular, the two-hour sitting, standing, and walking limitation and the 5% hand limitation—were not compatible with the medical record showing only a few documented flares. This rationale therefore stands on the underlying premise discussed in Section I about the frequency of flares. Perhaps this premise will be justified on remand after a better explanation, but for now it is not sufficient.

10

The second major rationale is the ALJ's claim that Dr. Nimmagadda was more qualified. In discussing his testimony, the ALJ listed the following reasons it deserved significant weight:

- Dr. Nimmagadda was "board certified in allergy and immunology."
- He "has practiced as a physician for a significant number of years."
- This experience "provides him with knowledge, training, and a perspective not shared by the other physicians of record and which could reasonably be expected to give him greater insight into the limitations imposed by the claimant's impairments."
- He has been an expert witness in Social Security disability cases since 1996 and "has knowledge of our disability program."
- He had "access to all of the medical evidence of record."

R. 44. However, when discussing Dr. Davidson's opinion, the ALJ ignored the subject entirely. This omission left the impression that Dr. Davidson's qualifications were inferior. In fact, one need not rely on this inference because, as quoted above, the ALJ directly stated that Dr. Nimmagadda had "*greater* insight" than "any"  other physician in the record. Dr. Davidson was one of those physicians of record.

If one were reading the ALJ's analysis cold, without having any outside knowledge, then the analysis might seem reasonable. But the rationale rests on a distorted factual presentation. The problem is not that the facts about Dr. Nimmagadda are wrong. The error lies in not including the facts about Dr. Davidson. Plaintiff supplies these missing facts contained in the record. Dr. Davidson's specialty was rheumatology, which is the most relevant specialty for diagnosing and treating lupus patients. Dr. Davidson had been practicing for 37 years versus 22 years for Dr. Nimmagadda. As for the claim that Dr. Nimmagadda had access to all the medical evidence, Dr. Davidson saw plaintiff the entire time and managed her care. In the hospital records, the emergency room doctors indicated that they had conferred with Dr. Davidson to coordinate plaintiff's care. This was not a case where the doctor giving the opinion only saw one small piece of the puzzle.

11

The ALJ considered none of these record facts. As a result, the analysis was clearly deficient, resulting in a one-sided—more pointedly, an inaccurate—picture. As this Court has repeatedly observed, it does not pass the basic test of fairness to compare two competing medical opinions by applying different standards to each of them. *See Murphy v. Berryhill*, 2018 WL 6610287, *4 (N.D. Ill. Nov. 28, 2018 ) ("it is important that ALJs employ the 'same metrics' and the 'same level of rigor' in evaluating multiple opinions"); *Vandiver v. Colvin*, 2015 WL 8013554, *3 (N.D. Ill. Dec. 7, 2015) ("the checklist has its greatest usefulness as a tool for making an apples-to-apples comparison between opinions.").

The Government responds to this specific issue by offering what is basically a harmless error analysis. Relying on the website for the Lupus Society of Illinois, the Government argues that, although rheumatologists are considered the best doctors to treat lupus patients, immunologists are also deemed capable of treating them. This fact, which the Court has no reason to question, does little to rectify the error. For one thing, it doesn't address the error that Dr. Davidson had more years of practice. But more importantly, this argument at best only results in a tie. It doesn't justify the ALJ's stronger claim that Dr. Nimmagadda's qualifications were *greater*. If the two men were equally qualified, then this rational would provide no basis for picking one over the other. In sum, the ALJ's second major rationale is clearly deficient.

Finally, the Court will briefly comment on a broader and slightly cynical justification lurking in the Government's brief. We will dub this the "sympathetic doctor" rationale. It is the idea that treating physicians are inherently biased in favor of their patients. The Government does not set forth this theory in a direct way, but it is hinted at throughout the brief. For example, the Government suggests that Dr. Anderson was suspiciously "too credulous" in believing plaintiff's statements. The Government repeatedly cites to two older Seventh Circuit cases

12

containing statements suggesting that treating physicians will "bend over backwards" to help their patients get disability benefits. *See* Dkt. #18 at 2, 4 (citing *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (a "treating physician's opinion . . . may also be unreliable if the doctor is sympathetic with the patient and thus 'too quickly find[s] disability'") (citation omitted); *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) (it is "well known [that] many physicians (including those most likely to attracts patients who are thinking of seeking disability benefits [])) will often bend over backwards to assist a patient in obtaining benefits")).

Although this rationale is not implausible on its face, the Court does not find that it provides a reliable basis for overlooking the ALJ's errors here. Several barriers exist but the Court will only address two. First, the ALJ never indicated he was relying on this rationale. So reliance on it here would raise *Chenery* concerns. Second, there are no facts in the record or developed to support this argument other than that Dr. Davidson was plaintiff's physician. *See, e.g.*, *Caroline M. C. v. Saul*, 2020 WL 1650587, *8 (N.D. Ind. Apr. 3, 2020) ("Apparently, the ALJ's implication is that Dr. Ocampo cannot be trusted because she has treated [the claimant] for many years and may have become emotionally attached to her patient. Without additional evidence of bias on the part of Dr. Ocampo, this implication seems like rank speculation and runs contrary to both the Hippocratic Oath and medical ethics."). Of course, if this was all that was necessary to disregard an opinion, then the treating physician rule (a creation of the administration by its own regulations) would be nugatory. For these reasons, we decline the Government's implied invitation to adopt this rationale.

13

### III.    The Credibility Rationales

Plaintiff also criticizes the ALJ's remaining credibility rationales—specifically, plaintiff's daily activities, which included serving as the primary caregiver for her daughter; her unwillingness to try to quit smoking on one occasion; and her conservative treatment.

Of these three rationales, the last is the one is the most vexing. The ALJ only superficially addressed this issue. At the start of the medical history, the ALJ made the conclusory statement that "each" of plaintiff's flares were "resolved with treatment." R. 38. The ALJ stated that prednisone was "remarkably beneficial in eliminating her joint pain." *Id.* At the end of the decision, in the credibility analysis, the ALJ asserted that plaintiff had only "received minimal and conservative treatment for his [sic] impairments[.]" R. 46. No further explanation was provided beyond this conclusory statement. The overall impression given by the ALJ was that plaintiff's lupus flares were treated fairly easily and quickly by simply taking prednisone.

But this picture oversimplifies the record by failing to consider contrary lines of evidence and by failing to acknowledge several well-known considerations from the case law. As plaintiff correctly notes, before an ALJ can downgrade a claimant's credibility for seeking only conservative treatment, the ALJ must explore several questions. First, are more aggressive treatments even available? *See* SSR 16-3p. Second, did plaintiff have a valid reason for not pursuing them? *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (an ALJ should explore possible explanations for why treatments were not pursued); *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). Here, the ALJ did not consider these questions. As a result, the record is not fully developed on these points. To cite one example, she argues that her hospitalization and emergency room trips were not consistent with the claim of minimal treatment. The ALJ did

14

not consider this argument. When the shoe is on the other foot, ALJs have readily discredited

claimants for not having gone to the emergency room or hospital.

The ALJ's analysis was also not grounded in a thorough review of the relevant facts.

Again, a brief background summary is helpful. The websites suggest that medications are the

main form of treatment. The Mayo Clinic lists the following as the ones most commonly used:

- **Nonsteroidal anti-inflammatory drugs (NSAIDs).** Over-the-counter NSAIDs, such as naproxen sodium (Aleve) and ibuprofen (Advil, Motrin IB, others), may be used to treat pain, swelling and fever associated with lupus. Stronger NSAIDs are available by prescription. Side effects of NSAIDs include stomach bleeding, kidney problems and an increased risk of heart problems.
- **Antimalarial drugs.** Medications commonly used to treat malaria, such as hydroxychloroquine (Plaquenil), affect the immune system and can help decrease the risk of lupus flares. Side effects can include stomach upset and, very rarely, damage to the retina of the eye. Regular eye exams are recommended when taking these medications.
- **Corticosteroids.** Prednisone and other types of corticosteroids can counter the inflammation of lupus. High doses of steroids such as methylprednisolone (A-Methapred, Medrol) are often used to control serious disease that involves the kidneys and brain. Side effects include weight gain, easy bruising, thinning bones (osteoporosis), high blood pressure, diabetes and increased risk of infection. The risk of side effects increases with higher doses and longer term therapy.
- **Immunosuppressants.** Drugs that suppress the immune system may be helpful in serious cases of lupus. Examples include azathioprine (Imuran, Azasan), mycophenolate mofetil (CellCept) and methotrexate (Trexall). Potential side effects may include an increased risk of infection, liver damage, decreased fertility and an increased risk of cancer.
- **Biologics.** A different type of medication, belimumab (Benlysta) administered intravenously, also reduces lupus symptoms in some people. Side effects include nausea, diarrhea and infections. Rarely, worsening of depression can occur.
- Rituximab (Rituxan) can be beneficial in cases of resistant lupus. Side effects include allergic reaction to the intravenous infusion and infections.

*See* Mayo Clinic Website ("Lupus:  Diagnosis & treatment").

The ALJ and Dr. Nimmagadda only really discussed plaintiff's use of prednisone.

However, as discussed below, this was not the only medication plaintiff took. But even if the

discussion were limited to prednisone, the ALJ's summary fails to acknowledge several

potentially relevant factors. While it is true in a general sense that prednisone helped to relieve

her symptoms, this effort was not a simple matter of flipping an on-off switch. The record

indicates that plaintiff and Dr. Davidson were continually adjusting the dosage, often increasing

it, sometimes to levels as high as 80 milligrams. According to the Mayo Clinic website, higher

doses are only prescribed when the disease is "serious" because higher doses carry increased

risks. Dr. Davidson's treatment notes reveal an ongoing process of trying to reduce plaintiff's

dosages in a process he referred to as "steroid-tapering." He also explored using other

medications in lieu of the prednisone (described as "steroid-sparing" medications). These

adjustments took time and effort, and even then the process was bumpy at times. To illustrate, set

forth below is a representative portion of Dr. Davidson's treatment notes:

> Progress Notes, James Russell Davidson, MD, 4/4/2017 11:19 AM, signed (continued)
> I then spent the majority of the visit predominated by counseling and
> coordination of care, over 29 minutes, discussing further steroid tapering
> and steroid-sparing agents that would be appropriate for her lupus. We will
> taper her to 20 mg a day alternating with 15 mg a day for two weeks and then
> reduce to 15 mg of prednisone per day. We will begin mycophenolate mofetil
> 500 mg twice daily. Warned regarding hematologic, renal, and
> immunosuppressive events.
>
> She will return in two months with a CBC and a CMP and consideration for
> further prednisone tapering.

R. 682. Overall, the difficulties in finding the right dosages are relevant because they raise the

question of whether plaintiff would have to miss work with extra doctor visits or while waiting

for the new dose to take effect, which was Dr. Davidson's point.

Although prednisone was plaintiff's primary medication, she also tried many others. This

fact was only briefly alluded to in the ALJ's decision and it was entirely ignored in the

Government's brief. In fact, the Government made the affirmative argument (one not actually

relied on by the ALJ and thus barred by *Chenery*) that plaintiff's pain allegations could be

discounted because she "was reluctant to take immunosuppressive medications." Dkt. #18 at 12. As discussed below, this argument is a non-starter.

But before discussing it, we will list some of the medications plaintiff took. The Mayo Clinic bullet-point list turns out to be a handy guide in this respect. Based on the medical record, plaintiff tried the following medications: NSAIDs (first bullet point); hydroxychloroquine (Plaquenil), which plaintiff took for many years (second bullet point); prednisone (third bullet point); methotrexate, azathioprine, and mycophenolate mofetil (fourth bullet point); and before the hearing she was in the process of taking steps to try Benlysta (fifth bullet point).[7] *See* R. 671, 675, 682, 688.

Turning back to the Government's contention that plaintiff was reluctant to take immunosuppressants, this argument firstly overlooks the fact that plaintiff may have had valid concerns about serious medical risks or side effects. But this argument is subject to a more damaging criticism—it is factually inaccurate. To support this claim, the Government cited from one treatment note from September 2015. *See* R. 561 (plaintiff "remains very concerned about taking immunosuppressive agents"). The clear suggestion is that plaintiff *never* took immunosuppressants. But this is wrong. The record shows that plaintiff *later* tried several of them—specifically, methotrexate, azathioprine, and mycophenolate mofetil (all immunosuppressants according to the Mayo Clinic list). *See* R. 671, 682, 802 (Dr. Sheree Lauth: "Pt takes several immunosuppressants[.]"). The fact that the Government overlooked this point is an indicator that the record needs more development and a more explicit analysis.

---

[7] It is true that many of these medications were not helpful and plaintiff stopped using them. But the mere fact that she was willing to try them should count in her favor to some degree. *See* SSR 16-3p ("Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.").

Having concluded that a remand is warranted, the Court will briefly comment on the remaining two credibility rationales. Plaintiff argues generally that the ALJ placed too much weight on her ability to care for her daughter, who was four years old at the time of the hearing, by overlooking the help she was receiving from her husband and mother-in-law. Among other facts, her husband twice took time off for work under the Family Medical Leave Act to help her manage the household. The Government argues essentially that the ALJ did not overweight this rationale and relied on other valid rationales. The parties engage in the familiar back and forth arguments. But further analysis would be unproductive because this issue is ultimately intertwined with the unresolved question about the frequency of the lupus flares because plaintiff acknowledges she "could perform household chores *when she was feeling able* but stated that it was difficult to perform daily tasks *during lupus flare-ups*." Dkt. #13 at 11 (emphasis added). As for the smoking rationale, plaintiff claims that the ALJ unfairly relied on one instance when a nurse asked plaintiff if she wanted to quit smoking and plaintiff declined. The Government, relying on a medical website, argues that quitting smoking helps alleviate lupus symptoms. Because the ALJ only briefly mentioned this issue, it is not clear that he put significant weight on it. Still, the issue should be addressed on remand with the other issues.

On remand the ALJ should call a new medical expert. Plaintiff's counsel and the ALJ should develop the record more during the hearing. The Court notes that plaintiff's counsel chose to ask no questions of Dr. Nimmagadda at the prior hearing even though, as we have discussed, his testimony was vague in important respects. Any failure to raise these arguments may result in a forfeiture of them if this case is again appealed to this Court.

18

**CONCLUSION**

For the foregoing reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date:  July 13, 2020                    By:  _____
                                             Iain D. Johnston
                                             United States Magistrate Judge